UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

TELAMERICA MEDIA, LLC, dba            :         CIVIL ACTION NO.  16 CV 5480
CADENT NETWORK,                       :
a Delaware limited liability company,  :         ECF CASE
                                      :
                    Plaintiff,        :
                                      :
        -v-                           :         COMPLAINT
                                      :
HUNTER, HAMERSMITH &                  :         JURY TRIAL DEMAND
ASSOCIATES ADVERTISING, INC.,         :
a Florida Corporation,                :
                                      :
                    Defendant.        :

---------------------------------------------------------------X

For its complaint against Defendant Hunter, Hamersmith & Associates Advertising, Inc. ("Defendant"), Plaintiff TelAmerica Media, LLC doing business as Cadent Network ("Plaintiff"), alleges as follows:

### NATURE OF CASE

1.      This lawsuit seeks more than $2 million Defendant owes Plaintiff for commercial inventory on local television broadcast stations it ordered from Plaintiff in 2015, the majority of which Plaintiff placed on Defendant's behalf, yet refuses to pay for in breach of the parties' agreement.

2.      In 2015, Defendant hired Plaintiff to execute an "unwired broadcast network" media buy for Defendant's primary client, Sandals and Beaches Resorts ("Sandals").  Per the parties' agreements, in exchange for Defendant's promised payment of millions of dollars, Plaintiff would utilize its unwired network of local broadcast television station advertising inventory to build a platform such that Sandals commercials would reach a national audience.

3.      Plaintiff's local television broadcast unwired network was built by aggregating available commercial space of local affiliates of major broadcast stations (affiliates of ABC, CBS, NBC, Fox, CW, etc.) in television markets all across the United States, including New York, such that the impressions across the country, or number of times viewers see an advertisement, would be equal to or greater than if a client had purchased the advertising time on one national television network such as ABC.

4.     The national advertising network created by Plaintiff's aggregation and purchase of local broadcast affiliate commercial inventory is known in the television advertising industry as an "unwired broadcast network."

5.     Plaintiff utilized this unwired broadcast network to construct a particular media plan for Defendant and its client Sandals for the first two quarters of 2015 for which Defendant paid in full.

6.     In May 2015, pursuant to agreements with Plaintiff, Defendant placed final, non-cancellable orders for similar advertising for the third and fourth quarters of 2015.

7.     Consistent with Defendants' order for the third quarter of 2015, Plaintiff ran Sandals advertising on the unwired broadcast network as promised.

8.     Plaintiff was prepared to fulfill Defendant's order for the fourth quarter of 2015 until Defendant abruptly and improperly cancelled its order in late September 2015, mere weeks before the quarter began.

9.     At the same time that this improper cancellation occurred, leaving Plaintiff scrambling to fill the fourth quarter commercial advertising inventory it had allotted to Defendant and its client, Defendant also informed Plaintiff that it would not pay for any of the advertising for the third quarter that it previously ordered and that had already run in its entirety, providing Defendant with the full benefit of this advertising.

10.     Plaintiff now seeks to recover its damages resulting from Defendant's refusal to pay for the third quarter advertising that Plaintiff ran for Defendant at its

instruction and for the losses caused by Defendant's improper and untimely

cancellation of its fourth quarter order.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this case pursuant to 28

U.S.C. § 1332 as a civil action between citizens of different states where the amount in

controversy exceeds the sum or value of $75,000.00.

12.     This Court has personal jurisdiction over Defendant because Defendant

has engaged in transactions and occurrences within the Southern District of New York.

Specifically, Defendant entered into agreements and communicated extensively with

Plaintiff in this case in this jurisdiction, provided advertising copy to Plaintiff in this

jurisdiction, and Defendant's advertisements ran in this jurisdiction.

13.     Moreover, Plaintiff's standard conditions, which Defendant accepted,

state as follows:

> The validity of this Agreement and the rights, obligations and relations of the
> Parties hereunder shall be construed and determined under and in accordance
> with the laws of the State of New York; . . . Suit to enforce any provision of this
> Agreement, or any right, remedy or other matter arising therefrom, will be
> brought exclusively in the state or federal courts located in New York City, New
> York. [Defendant] and Advertiser each agrees and consents to venue in New
> York City, New York and to the in personam jurisdiction of the aforementioned
> courts.

14.     Venue is proper in the United States District Court for the Southern

District of New York under 28 U.S.C. § 1391(b)(2) and (3), and under the parties'

agreement as set forth above.

## PARTIES

15.     Plaintiff is a Delaware limited liability company with a principal place of business located at 1701 John F. Kennedy Boulevard, Suite 2510, Philadelphia, Pennsylvania 19103.  Plaintiff maintains a significant office in New York, New York, at 1450 Broadway, Suite 502, wherein the majority of Plaintiff's executive team works and operates.

16.     Defendant is a Florida profit corporation with a principal place of business located at 725 NE 125th Street, North Miami, Florida 33161.

## GENERAL FACTUAL ALLEGATIONS

<u>Plaintiff Is a Preeminent Provider of Unwired Networks in Broadcast and Cable Television</u>

17.     For over twenty years, Plaintiff has been providing advertisers, agencies, and businesses with a nearly unparalleled ability to reach a national television audience through unwired cable network advertising.  Recently, Plaintiff expanded to offer the same ability through its unwired broadcast network.

18.     Traditionally, when an advertiser or its agency sought to reach a national television audience for their advertising, it or they would purchase national advertising time from a broadcast or cable network platform such as CBS, ABC (broadcast) or ESPN, Nickelodeon, or USA Network (cable).

19.     During the commercial breaks of a television program, certain commercial inventory is allocated to national advertising, while other slots are allocated to local or regional advertising depending upon the local cable providers or local broadcast

affiliates.  National television advertisement inventory is generally more expensive than that allocated regionally or locally.

20.     To achieve the benefits of national advertising with greater efficiency and ability to target impressions towards specific audience segments, and potentially at a lower cost, Plaintiff utilizes what is known in the industry as an "unwired network."

21.     Unwired networks are built by purchasing and aggregating unused commercial time on cable stations or local broadcast network affiliates throughout the United States and turning that inventory into a national footprint with a reach that, in Plaintiff's case, can approximate and even exceed the reach of national stations.

22.     Plaintiff's cable and broadcast unwired networks then are able to be tailored and configured for particular clients so as to target segments of the population, regions, or other demographics which offers a cost-effective alternative or supplement to Plaintiff's advertiser and advertising agency partners compared to strictly national network advertising.

23.     Plaintiff's customers now can select from at least two different types of unwired networks: (a) "broadcast," which is the unwired network purchased and compiled by Plaintiff that will consist exclusively of local affiliates of over-the-air broadcast stations such as affiliates of ABC, NBC, CBS, Fox, and CW; and (b) "cable," which is an unwired network that will consist exclusively of cable inventory compiled and purchased by Plaintiff from cable systems such as Comcast, Charter, or Time Warner.

24.     Plaintiff is one of a handful of companies that pioneered the unwired network industry in the 1990s and is one of the most significant and well-known providers in the industry.

25.     Unwired network advertising has been well-known since at least the early 1990s to advertisers and agencies alike.

26.     It is known and understood within the advertising industry that when an advertiser or agency chooses to utilize an unwired network (broadcast or cable) as opposed to traditional national television advertising, the advertiser or agency forgoes much of the control of and certainty as to where and when its advertisements run (i.e., one network at a particular time).  In exchange, with unwired advertising, the customer receives a possibly more discounted rate and a more tailored plan.

27.     Unlike the traditional national television advertising model in which the advertiser typically selects a specific channel and time in which its advertisement will appear, an advertiser who chooses Plaintiff's unwired broadcast network advertising relies upon Plaintiff to select and aggregate inventory within its broader network to attempt to meet the advertiser's marketing goals as close as possible (e.g. impressions, frequency, demographics, advertising length).  Such advertiser makes the choice to use an unwired network knowing that there is no guarantee that its advertising will run on particular and specific networks or in certain time-slots.

Defendant Expands Beyond Its Longtime Cable Unwired Networking Relationship
with Plaintiff and Purchases Unwired Broadcast Network Advertising for Sandals for
the First Half of 2015

28.     Defendant is an advertising agency whose primary client is Unique

Vacations, Inc., otherwise known as Sandals.

29.     Plaintiff and Defendant have a long-standing relationship for Sandals

advertising.  Defendant has conducted business with Plaintiff primarily for Sandals

since at least the year 2000 and has placed many millions of dollars in advertising with

Plaintiff in New York since 2004.  Although Defendant's business for Sandals with

Plaintiff historically focused on cable rather than broadcast unwired advertising,

Defendant nonetheless was and is well aware of how unwired advertising works.

30.     In December 2014, Plaintiff and Defendant began discussing the

expansion of Defendant's Sandals advertising to add unwired broadcast advertising.

Defendant was interested in purchasing unwired broadcast advertising to air in the

morning and evening news time slots, and on syndicated television.

31.     Based on Defendant's representations, Plaintiff selected and packaged

advertising inventory that met Defendant's criteria, and then presented Defendant its

offer to execute a custom unwired broadcast network media buy for Sandals.

32.     The unwired broadcast network media plan constructed by Plaintiff and

proposed to Defendant consisted of inventory Plaintiff already owned and would have to

reserve for Defendant.  Thus, to the extent Defendant declined to execute and purchase

the inventory media plan offered by Plaintiff, Plaintiff would need to sell that inventory

to another customer to recover its investment.  Or, to the extent to which Defendant

committed to the inventory but later declined to follow through with such agreement, Plaintiff would have to sell that inventory to a different customer.

33.     Consistent with its customary practice, Plaintiff provided Defendant with a prototypical station line-up media plan, which is a list of potential local broadcast stations upon which Defendant's Sandals advertising may run—this often includes stations across a broad spectrum of cities around the country.

34.     As is commonly known and understood in the industry, and as Plaintiff made clear to Defendant, there was no guarantee that Defendant's advertising would necessarily run on every station on the prototypical stations list provided or the ultimate media plan agreed upon containing a prototypical list.

35.     Plaintiff did guarantee Defendant that Sandals advertisements on its unwired broadcast network would reach at least eighty-five percent coverage of U.S. television households.  This promise provides security about the broad reach of Plaintiff's unwired broadcast network and how it replicates or beats a national advertising buy from a single network.

36.     Other types of guarantees in unwired advertising do not occur.  Plaintiff never made any other guarantees to Defendant.  How such advertisements would be distributed across markets within the United States is not and was not guaranteed.  And, while Plaintiff does make every effort to hue to prototypical station lineup or media plan regarding time-slots because it owns inventory in such slot, whether such advertisements would actually appear on specific stations or at specific times within the morning or evening news is also and was also not guaranteed.

37.     Defendant accepted Plaintiff's proposal for the first quarter of 2015 sent from New York, and Plaintiff began to air advertising for Sandals on its unwired broadcast network on January 5, 2015.

38.     On March 16, 2015, Defendant agreed to Plaintiff's media plan sent from New York for Sandals advertising and committed to approximately one million dollars of second quarter unwired broadcast advertising for Sandals.

39.     Plaintiff provided Defendant with a prototypical station line-up for the second quarter, and again advised Defendant that the stations were not guaranteed.

40.     Defendant and Plaintiff discussed Defendant's specific requests about what it hoped its media buy would look like within the prototypical station line-up.  For example, Defendant requested that Sandals advertisements run in specific markets, and even on specific stations in those markets.  Defendant further discussed its belief that the advertisements for the first quarter were appearing too often on non-"legacy" broadcast networks such as the CW or MyNetworkTV.

41.     Plaintiff listened to Defendant's concerns and made efforts to tailor its offerings wherever possible, but it made no additional guarantees beyond that the advertisements would reach eighty-five percent of the country.  Indeed, while Plaintiff could make efforts to focus on Defendant's requests, specific station identifications, and other pointed requests are not achievable in unwired advertising.  Those types of requests are better suited towards national advertising buys or what is called "spot buying"—where particular commercial spots are purchased at a higher cost.

42.     Given Defendant's lengthy experience with Plaintiff in unwired advertising on cable, Defendant knew and was aware of what could and could not be guaranteed and the underlying flexibility required for unwired advertising.

43.     However, because Plaintiff is so adept in its business as a result of its many years of experience in the industry, despite having no obligation to do so, Plaintiff's efforts to ameliorate Defendant's concerns were effective.  Indeed, Sandals advertising ran in markets, on networks, and at times that satisfied Defendant's requests.

44.     Plaintiff provided Defendant with monthly invoices for all advertising run on Plaintiff's unwired local broadcast network for Defendant on behalf of Sandals.

45.     As further proof of its services, Plaintiff provided Defendant with industry-customary extensive reports ("post-run affidavits") detailing exactly where and when Defendant's advertising ran in each quarter.

46.     These reports necessarily are based upon information provided by the individual broadcast television stations that actually air the spots, and accordingly Plaintiff must wait to receive such information from the stations before the reports may be delivered to Defendant.

47.     But Plaintiff swiftly provided this information to Defendant in accordance with customary practice.  For example, the first quarter report was provided to Defendant on April 20, 2015, approximately three weeks after the quarter ended.  Similar reports were provided to Defendant for each quarter of 2015 where advertising ran.

48.     Plaintiff invoiced Defendant for both the first and second quarter of 2015 for the unwired broadcast network advertising that Plaintiff ran for Defendant. Defendant paid those invoices.

Defendant Commits to Unwired Broadcast Advertising for the Remainder of 2015, Including the Third and Fourth Quarters

49.     On May 19, 2015, Defendant agreed to order third quarter unwired broadcast network advertising for Sandals from Plaintiff.

50.     On May 28, 2015, Defendant agreed to order fourth quarter unwired broadcast network advertising for Sandals from Plaintiff.

51.     Based on Defendant's third and fourth quarter orders in May of 2015, Plaintiff reserved a large swath of its owned inventory at local broadcast affiliates for Defendant for the rest of 2015, and did not market or sell that inventory to others.

52.      Plaintiff provided Defendant with its standard terms and conditions for unwired advertising (for cable or broadcast) dated June 25, 2015 ("Standard Terms"). A copy of the Standard Terms is attached hereto as Exhibit 1.

53.     Defendant ordered and committed to purchase third quarter 2015 advertising inventory from Plaintiff with a cost of $2,293,098.

54.     Defendant ordered and committed to purchase fourth quarter 2015 advertising inventory from Plaintiff with a cost of $1,709,340.

55.     Defendant's third and fourth quarter orders were placed through Plaintiff's New York office.

56.     Defendant knew and understood that its local broadcast unwired network orders were firm and non-cancellable.  Indeed, Section 8 of the Standard Terms that Defendant received and agreed to is entitled "Cancellation" and provides that orders are considered firm and non-cancellable.  *See* Ex. 1, § 8.

57.     On June 12, 2015, roughly three weeks before the third quarter was set to begin on July 1, 2015, Brian Ludwick, an employee of Defendant, e-mailed Plaintiff in New York discussing a possible modification of a portion of the third and fourth quarter advertising Defendant had previously ordered ("June 12 E-mail").

58.     Showing that Defendant understood and had agreed upon the non-cancellable nature of the orders, Mr. Ludwick acknowledged in the June 12 E-mail that it was Plaintiff's decision as to whether to accept Defendant's request for a downward modification.

59.     Plaintiff did not accept Defendant's request to modify the orders, and the parties continued their business relationship.

Plaintiff Delivers on Its Obligation to Run Sandals Advertising on Defendant's Behalf; Defendant Refuses to Pay for the Advertising It Ordered, Causing Significant Damage to Plaintiff

60.     In reliance upon Defendant's acceptance of the Standard Terms and its non-cancellable orders for the third and fourth quarters, Plaintiff began implementing Defendant's unwired broadcast network media plan for Sandals for the third quarter on July 1, 2015.  As with the first half of 2015, Plaintiff continued to deliver quality advertising to Defendant through its unwired broadcast network in a manner befitting an industry leader and tailored as much as possible to Defendant's preferences.

61.     Plaintiff met or exceeded its guarantee to place Sandals advertising in at least eighty-five percent of the country.

62.     Even though there was no guarantee to do so, the Sandals advertisements aired overwhelming on stations listed in the prototypical line-ups provided to Defendant.  Advertising on "non-legacy" networks such as CW and MyNetwork TV made up less than sixteen percent of the overall advertising in each quarter.

63.     Sandals advertisements ran on at least one "legacy" (ABC, CBS, NBC, FOX) network station in the largest United States markets, including New York, Los Angeles, Chicago, San Francisco, Dallas, Atlanta and Miami.

64.     Finally, again, even though there was no guarantee to do so, because of Plaintiff's efforts, the majority of the advertising during the morning slots aired after 5:30 a.m., consistent with Defendant's stated preference.

65.     Consistent with its customary practice, Plaintiff invoiced Defendant each month for advertising actually run during the third quarter of 2015.  The amount of the invoices for third quarter, and the one payment made by Defendant, are as follows:

|   | July 2015 | August 2015 | September 2015 | Grand Total |
|---|---|---|---|---|
| Invoice Amount | 595,268.60 | 744,107.00 | 523,945.10 | 1,863,320.70 |
| Payments | (149,275.53) | | | (149,275.53) |
| Total | 445,993.07 | 744,107.00 | 523,945.10 | **1,714,045.17** |

66.     Despite multiple requests by Plaintiff, Defendant refuses to pay Plaintiff the $1,714,045.17 owed for the actual amount of Sandals advertising that ran during the third quarter of 2015, plus interest.

Defendant Improperly Cancels Its Fourth Quarter Order, Damaging Plaintiff

67.     Because Plaintiff had reserved its already-purchased fourth quarter inventory for Defendant, on July 7, 2015, Michael Bollo, an employee of Plaintiff in New York, emailed Mr. Ludwick out of an abundance of caution in light of the June 12 E-Mail to confirm that Defendant intended to meet its prior commitment to fourth quarter advertising inventory.  Mr. Bollo further questioned whether Defendant wished for Plaintiff to attempt to put the committed inventory in "sell off," which would be an attempt by Plaintiff to resell the inventory to a third party at the last minute.

68.     Mr. Ludwick responded by saying:  "Good point.  Let me check."  But Defendant never responded further to Plaintiff's sell-off inventory inquiry.

69.     Plaintiff therefore reasonably relied upon Defendant's failure to inform Plaintiff of anything but an intention by Defendant to honor its fourth quarter order.

70.     But then, on September 15, 2015, after it was too late for Plaintiff to fully minimize its damages, mere weeks before the September 28, 2015 start of the fourth quarter, Defendant emailed Plaintiff stating that Defendant was "suspending [the unwired broadcast network] program indefinitely, effective immediately."

71.     Defendant further stated, in anticipatory breach of the parties' agreement, that any advertising that "runs" during the fourth quarter of 2015 "is not authorized and will not be paid."

72.     After receipt of the September 15, 2015 email, Plaintiff advised Defendant that its attempted cancellation of the fourth quarter order was not valid and that it would be responsible for the entirety of its prior order.

-14-

73.     Plaintiff nonetheless, in an effort to mitigate its damages, used its best efforts to sell off the fourth quarter of 2015 advertising inventory previously reserved for Defendant.

74.     This was an extremely difficult task because Plaintiff hand-selected all of the inventory that was committed to Defendant specifically for inclusion in Defendant's unwired network media plan based upon Defendant's preferences.

75.     Plaintiff thus was forced to essentially dismantle the national media plan and sell the inventory in discrete parts to the highest bidder in a severely compressed time frame.

76.     Plaintiff was able to sell off some inventory, but at a lower than fair market value.

77.     Some of the inventory went unsold, resulting in even larger losses to Plaintiff.

78.     Plaintiff's losses in this regard amount to over $100,000 for inventory that it was able to sell, but only at a rate lower than what Defendant had committed to under its agreement with Plaintiff for the fourth quarter 2015, and over $200,000 for inventory that Plaintiff was unable to sell off at the late juncture.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Third Quarter Advertising)

79.     Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

80.     Plaintiff and Defendant entered into a valid and binding agreement for the purchase and sale of unwired broadcast network advertising for Sandals during the third quarter of 2015.

81.     Plaintiff satisfied its obligations under the agreement for the third quarter of 2015 by its placement of Sandals advertising on Defendant's behalf on local affiliate broadcast stations around the United States, including in New York, over a three-month period.

82.     Defendant breached the agreement by not paying Plaintiff for the Sandals advertising Plaintiff aired on its unwired broadcast network during the third quarter of 2015.

83.     As a direct and proximate result of Defendant's breach of the order for the third quarter of 2015, Plaintiff has suffered and will continue to suffer direct, incidental, and consequential damages in an amount to be proven at trial, but no less than $1,714,045.17, plus interest and costs, including attorneys' fees as provided for in the Standard Terms.

### SECOND CAUSE OF ACTION
### (Unjust Enrichment/Quantum Meruit – Third Quarter Advertising – In the Alternative to Count One)

84.     Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

85.     Plaintiff pleads this claim in the alternative to Count One, in the event the parties' agreement for the third quarter is found to have failed or Plaintiff is otherwise

found to have no rights under that agreement, or if the dispute is found to be outside of the subject matter of that agreement.

86.     At Plaintiff's expense, Plaintiff in good faith conferred on Defendant the benefit of airing Sandals advertising on the unwired broadcast network during the third quarter of 2015, which benefit Defendant accepted.

87.     Plaintiff reasonably expected to be paid for advertising it placed on Defendant's behalf on the unwired broadcast network during the third quarter of 2015 and is entitled to the reasonable value of such placements.

88.     Defendant's retention of the benefit of such advertising without payment to Plaintiff would be unjust.

89.     Defendant's wrongful conduct has caused Plaintiff to sustain damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Breach of Contract – Fourth Quarter Advertising)

90.     Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

91.     Plaintiff and Defendant entered into a valid and binding agreement for the purchase and sale of unwired broadcast network advertising for Sandals during the fourth quarter of 2015.

92.     Plaintiff satisfied its obligations under the agreement for the fourth quarter of 2015, or those obligations were excused.

93.     Defendant anticipatorily breached the agreement for the fourth quarter by purporting to cancel the agreement, and expressly advising Plaintiff after it was too late that it would not pay for any advertising that would run in the fourth quarter of 2015.

94.     As a direct and proximate result of Defendant's breach of the agreement for the fourth quarter, Plaintiff has suffered and will continue to suffer direct, incidental, and consequential damages in an amount to be proven at trial, but no less than $300,000 plus interest and costs, including attorneys' fees as provided for in the Standard Terms.

**FOURTH CAUSE OF ACTION**
**(Promissory Estoppel – Fourth Quarter Advertising –**
**In the Alternative to Count Three)**

95.     Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

96.     Plaintiff pleads this claim in the alternative to Count Three, in the event the parties' agreement for the fourth quarter of 2015 is found to have failed or Plaintiff is otherwise found to have no right under that agreement, or if the dispute is found to be outside of the subject matter of that agreement.

97.     In May of 2015, Defendant made a clear and unambiguous promise to purchase fourth quarter of 2015 advertising on local affiliate broadcast networks as part of an unwired network buy from Plaintiff.

98.     Plaintiff reasonably and foreseeably relied upon Defendant's promise by reserving or otherwise acquiring local affiliate broadcast commercial inventory on Defendant's behalf.

99.     As a result of Plaintiff's reliance, Plaintiff suffered damages in an amount to be determined at trial.

WHEREFORE Plaintiff prays for relief as follows:

1.     The Court enter judgment in favor of Plaintiff and against Defendant and award Defendant damages in an amount to be determined at trial, but no less than $2,014,045.17;

2.     The Court award Plaintiff interest and reasonable attorneys' fees, costs and expenses as provided by law and the Standard Terms; and

3.     The Court enter an order granting Plaintiff such other and further relief as the Court deems just and proper.

<u>JURY TRIAL DEMAND</u>

Plaintiff hereby demands a jury trial for all issues so triable as of right.

Dated:  July 8, 2016

_s/ Marc Rachman_
Marc Rachman
mrachman@dglaw.com
Claudia Cohen
ccohen@dglaw.com
DAVIS & GILBERT LLP
1740 Broadway
New York, New York  10019
Phone: (212) 468-4800
Fax: (212) 468-4888


Evan M. Rothstein (Pro Hac Vice application to be filed)
erothstein@bhfs.com
Kerry LeMonte (Pro Hac Vice application to be filed)
klemonte@bhfs.com
BROWNSTEIN HYATT FARBER SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, Colorado 80202-4432
Telephone: (303) 223-1116

*Attorneys for Plaintiff TelAmerica Media, LLC,
dba Cadent Network.*