UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TELAMERICA MEDIA, LLC d/b/a CADENT NETWORK, a Delaware limited liability company,<br><br>       Plaintiff,<br><br>   v.<br><br>HUNTER, HAMMERSMITH & ASSOCIATES ADVERTISING, INC., a Florida Corporation,<br><br>       Defendant. | Index No. 16-cv-05480(DAB)<br><br>**DEFENDANT HUNTER HAMERSMITH & ASSOCIATES ADVERISTING, INC.'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** |

Defendant, Hunter, Hamersmith & Associates Advertising, Inc. ("Defendant" or "HHA"), by and through its undersigned counsel, hereby answers Plaintiff, TelAmerica Media, LLC dba Cadent Network's ("Plaintiff" or "Cadent") Complaint, and states as follows:

**NATURE OF THE ACTION**

1.    Defendant admits that Plaintiff is seeking $2 million in this lawsuit. Defendant denies the remaining allegations of Paragraph 1.

2.    Denied.

3.    Defendant is without knowledge regarding the allegations of Paragraph 3, and therefore, these allegations are denied.

4.    Defendant is without knowledge regarding the allegations of Paragraph 4, and therefore, these allegations are denied.

5.    Defendant admits that Plaintiff constructed a media plan for Defendant for the first and second quarters of 2015 using an unwired broadcast network. Defendant further admits that it paid the amounts invoiced to Defendant for the first and second quarters, but that such invoiced amounts were subject to adjustment based on post buy analysis confirmation.

6.    Denied.

7.    Denied.

8.    Denied.

9.    Denied.

10.    Defendant admits that Plaintiff is seeking damages, but denies that it is entitled to such relief.

## JURISDICTION AND VENUE

11.    Admitted.

12.    Admitted in part and denied in part.   Admitted that this Court has personal jurisdiction over Defendant; otherwise denied.

13.    Denied.

14.    Defendant admits that venue is proper, but denies that venue is proper under the parties' alleged agreement.

## PARTIES

15.    Defendant admits that Plaintiff is a Delaware limited liability company. Defendant is without knowledge regarding the remaining allegations of Paragraph 15, and therefore, those allegations are denied.

16.    Admitted.

## GENERAL FACTUAL ALLEGATIONS

17.    Defendant admits that Plaintiff has provided unwired cable network advertising for at least 15 years (the number of years during which Defendant purchased cable advertising from Plaintiff), but is without knowledge regarding the remaining allegations in the first sentence of Paragraph 17, and therefore, those allegations are denied. Defendant admits the allegations in the second sentence of Paragraph 17.

18.     Defendant is without knowledge as to whether the allegations of Paragraph 18 are true in all cases, and therefore, these allegations are denied.

19.     Defendant is without knowledge as to whether the allegations of Paragraph 19 are true in all cases, and therefore, these allegations are denied.

20.     Defendant is without knowledge as to whether the allegations of Paragraph 20 are true in all cases, and therefore, these allegations are denied.

21.     Defendant is without knowledge regarding the allegations of Paragraph 21, and therefore, these allegations are denied.

22.     Denied.

23.     Defendant is without knowledge regarding the allegations of Paragraph 23, and therefore, these allegations are denied.

24.     Defendant is without knowledge regarding the allegations of Paragraph 24, and therefore, these allegations are denied.

25.     Defendant is without knowledge regarding the allegations of Paragraph 25, and therefore, these allegations are denied.

26.     Denied.

27.     Denied.

28.     Admitted.

29.     Admitted in part and denied in part.   The allegations of Paragraph 29 are admitted, except for the allegation that Defendant "was and is well aware of how unwired advertising works" which is denied.

30.     Admitted in part and denied in part.   Admitted that Plaintiff and Defendant conducted the alleged discussions, but denies Paragraph 30 to the extent it may imply that

Defendant initiated such discussions.  In fact, Plaintiff initiated such discussions. Defendant further denies that Plaintiff and Defendant discussed advertising on syndicated television at that time.

      31.    Denied.

      32.    Defendant is without knowledge regarding the allegations of Paragraph 32, and therefore, the allegations are denied.

      33.    Admitted in part and denied in part.  Admitted that Plaintiff provided Defendant with a station line-up for designated media areas; the remaining allegations in Paragraph 33 are denied.

      34.    Denied.

      35.    Defendant admits the allegations set forth in the first sentence of Paragraph 35, and is without knowledge regarding the allegations set forth in the second sentence of Paragraph 35, and therefore, those allegations are denied.

      36.    Denied.

      37.    Admitted in part and denied in part.  Defendant admits that it accepted Plaintiff's proposal for the first quarter of 2015, but denies that Plaintiff's proposal incorporated all of the terms agreed upon by the parties.  As set forth in Defendant's Counterclaim, the proposal was subject to additional terms.  The remaining allegations in Paragraph 37 are denied.

      38.    Admitted in part and denied in part.  Defendant admits that it accepted Plaintiff's proposal dated March 12, 2015 but denies that the proposal incorporated all of the terms agreed upon by the parties.  As set forth in Defendant's Counterclaim, the proposal was subject to additional terms.  The remaining allegations in Paragraph 38 are denied.

      39.    Denied.

40.     Denied as ambiguous.   Paragraph 40 does not specify when the alleged discussions took place.  Prior to accepting Plaintiff's proposal for the second quarter of 2015, Defendant and Plaintiff did discuss, and then agreed, that the advertisements for each designated media area would be limited to the stations identified as "prototypical stations" for that area. The remaining allegations in Paragraph 40 are denied.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Admitted in part and denied in part.  Defendant admits that Plaintiff submitted monthly invoices to Defendant; Defendant denies Paragraph 44 to the extent it implies that the advertisements referenced on the invoices actually ran.  The remaining allegations in Paragraph 44 are denied.

45.     Admitted in part and denied in part.  Defendant admits that Plaintiff submitted reports to Defendant purporting to detail the advertisements that actually ran; Defendant denies that such reports were compliant with industry custom or the agreement of the parties. The remaining allegations in Paragraph 45 are denied.

46.      Defendant is without knowledge regarding the allegations of Paragraph 46, and therefore, the allegations are denied.  In any event, Plaintiff has not furnished Defendant with information from the referenced individual broadcast television stations.

47.     Admitted in part and denied in part. Defendant admits that it received reports from Plaintiff on April 20, 2015 and on June 3, 2015 purporting to cover the first quarter of 2015; Defendant denies that such reports were compliant with industry custom or the agreement of the parties. The remaining allegations in Paragraph 47 are denied.

48.     Admitted in part and denied in part.  Defendant admits that Plaintiff invoiced Defendant for both the first and second quarters and that Defendant paid the amounts that were invoiced; Defendant denies that such payments were final because the invoiced amounts were subject to adjustment based on post buy analysis confirmation.

49.     Admitted in part and denied in part.  Defendant admits that it accepted Plaintiff's proposal dated May 19, 2015 covering the third quarter of 2015 but denies that the proposal incorporated all of the terms agreed upon by the parties.   As set forth in Defendant's Counterclaim, the proposal was subject to additional terms.   The remaining allegations in Paragraph 49 are denied.

50.     Admitted in part and denied in part.  Defendant admits that it accepted Plaintiff's proposal dated May 28, 2015 covering the fourth quarter of 2015 but denies that the proposal incorporated all of the terms agreed upon by the parties.   As set forth in Defendant's Counterclaim, the proposal was subject to additional terms.   The remaining allegations in Paragraph 50 are denied.

51.     Defendant is without knowledge regarding the allegations of Paragraph 51, and therefore, the allegations are denied.

52.     Admitted in part and denied in part. Defendant admits that Plaintiff provided Defendant with the document attached to the Complaint as Exhibit 1, but Plaintiff provided this document to Defendant in connection with Plaintiff's placement of cable advertising to Defendant – not its placement of unwired broadcast advertising which is the subject of Plaintiff's action.  Defendant denies that this document applies to or governs in anyway the agreements of Plaintiff and Defendant covering unwired broadcast advertising.   Indeed, the document *post*-dates the formation of all the unwired broadcast agreements which Plaintiff alleges Defendant

purportedly breached.  The attachment of this document to the Complaint as an exhibit is a sham pleading.

53.     Admitted in part and denied in part.  Defendant admits that it ordered an committed to purchase advertising from Plaintiff totaling $2,293,098.00 for third quarter unwired broadcast advertising, but such agreement was subject to the additional terms set forth in Defendant's Counterclaim, including its right of cancellation and that Plaintiff would provide post buy analysis confirmation. The remaining allegations in Paragraph 53 are denied.

54.     Admitted in part and denied in part.  Defendant admits that it agreed to pay Plaintiff $1,709,340.00, but such agreement was subject to the additional terms set forth in Defendant's Counterclaim, including its right of cancellation and that Plaintiff would provide post buy analysis confirmation. The remaining allegations in Paragraph 54 are denied.

55.     Defendant is without knowledge regarding the allegations of Paragraph 55, and therefore, the allegations are denied.

56.     Denied.

57.     Defendant admits that Defendants sought to cancel the morning news and syndication portions of the third quarter unwired broadcast media plan, but denies that Defendant "acknowledged" that it was Plaintiff's decision whether the order can be cancelled. The remaining allegations in Paragraph 57 are denied.

58.     Denied.

59.     Denied.

60.     Defendant admits that Plaintiff implemented a slightly modified version of the third quarter unwired broadcast media plan, but denies the remaining allegations of Paragraph 60.

61.     Denied.

62.     Defendant is without knowledge regarding the allegations of Paragraph 62, and therefore, the allegations are denied.

63.     Defendant is without knowledge regarding the allegations of Paragraph 63, and therefore, the allegations are denied.

64.     Defendant is without knowledge regarding the allegations of Paragraph 64, and therefore, the allegations are denied.

65.     Admitted in part and denied in part.  Defendant admits that Plaintiff invoiced Defendant for the amounts shown for the third quarter of 2015; Defendant denies the remaining allegation of Paragraph 65.

66.     Denied that Defendant owes Plaintiff $1,714,045.17 plus interest.

67.     Admitted in part and denied in part.  Defendant admits that Bollo sent Ludwick and email on July 7, 2015.  The contents of that email speak for themselves.  The remaining allegations of Paragraph 67 are denied.

68.     Admitted in part and denied in part.  Defendant admits that Ludwick sent Bollo an email in response to Bollo's July 7, 2015 email.  The contents of Ludwick's email speak for themselves.  The remaining allegations of Paragraph 68 are denied.

69.     Denied.

70.     Admitted in part and denied in part.  Defendant admits that on September 15, 2015, Defendant informed Plaintiff in writing that it was "suspending the program indefinitely, effective immediately." Defendant denies the remaining allegations of Paragraph 70.

71.     Admitted in part and denied in part.  Defendant admits that on September 15, 2015, it further informed Plaintiff in the same writing that any advertising that ran during the

fourth quarter was not authorized and would not be paid for. Defendant denies the remaining allegations of Paragraph 71.

72.     Admitted in part and denied in part. Defendant admits that Plaintiff advised Defendant that the September 15, 2015 cancellation of the Fourth Quarter was not valid. Defendant denies the remaining allegations of Paragraph 72.

73.     Defendant is without knowledge regarding the allegations of Paragraph 73, and therefore, the allegations are denied.

74.     Defendant is without knowledge regarding the allegations of Paragraph 74, and therefore, the allegations are denied.

75.     Defendant is without knowledge regarding the allegations of Paragraph 75, and therefore, the allegations are denied.

76.     Defendant is without knowledge regarding the allegations of Paragraph 76, and therefore, the allegations are denied.

77.     Defendant is without knowledge regarding the allegations of Paragraph 77, and therefore, the allegations are denied.

78.     Defendant is without knowledge regarding the allegations of Paragraph 78, and therefore, the allegations are denied.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Third Quarter Advertising)

79.     Defendant repeats its responses to Paragraphs 1 through 78.

80.     Admitted in part and denied in part.  Defendant admits that it entered into an agreement with Plaintiff for the purchase and sale of unwired broadcast advertising for Sandals for the third quarter of 2015; Defendant denies that such agreement was reflected solely by Plaintiff's proposal for the third quarter as previously alleged. As set forth in Defendant's

Counterclaim, the proposal was subject to additional terms.   The remaining allegations in Paragraph 80 are denied.

81.     Denied.

82.     Denied.

83.     Denied.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment/Quantum Meruit – Third Quarter Advertising – In the Alternative to Count One)

84.     Defendant repeats its responses to Paragraphs 1 through 83.

85.     Admitted that Plaintiff pleads its Second Cause of Action in the alternative to its First Cause of Action.

86.     Denied.

87.     Defendant is without knowledge regarding the allegations of Paragraph 87 that Plaintiff reasonably expected to be paid for advertising it aired on the unwired broadcast network during the third quarter of 2015, and therefore, those allegations are denied. Defendant denies that Plaintiff is entitled to the reasonable value of such placements.

88.     Denied.

89.     Denied.

## THIRD CAUSE OF ACTION
### (Breach of Contract – Fourth Quarter Advertising)

90.     Defendant repeats its responses to Paragraphs 1 through 89.

91.     Admitted in part and denied in part.   Defendant admits that it entered into an agreement with Plaintiff for the purchase and sale of unwired broadcast advertising for Sandals for the fourth quarter of 2015; Defendant denies that such agreement was reflected solely by Plaintiff's proposal for the fourth quarter as previously alleged. As set forth in Defendant's

Counterclaim, the proposal was subject to additional terms. The remaining allegations in Paragraph 91 are denied.

92.    Denied.

93.    Denied.

94.    Denied.

## FOURTH CAUSE OF ACTION
### (Promissory Estoppel – Fourth Quarter Advertising – In the Alternative to Count Three)

95.    Defendant repeats its responses to Paragraphs 1 through 94.

96.    Defendant admits that Plaintiff pleads its Fourth Cause of Action in the alternative to the Third Cause of Action.

97.    Admitted in part and denied in part. Defendant admits that it entered into an agreement with Plaintiff for the purchase and sale of unwired broadcast advertising for Sandals for the fourth quarter of 2015; Defendant denies that such agreement was reflected solely by Plaintiff's proposal for the fourth quarter as previously alleged. As set forth in Defendant's Counterclaim, the proposal was subject to additional terms. The remaining allegations in Paragraph 97 are denied.

98.    Defendant is without knowledge regarding the allegations of Paragraph 98, and therefore, the allegations are denied.

99.    Denied.

100.    All of the allegations of the Complaint that have not been expressly admitted herein are denied.

## AFFIRMATIVE DEFENSES

Without altering the burden of proof, Defendant asserts the defenses set forth below. These defenses are asserted by Defendant based upon an investigation of the asserted allegations

that is not yet complete, and will remain so pending discovery in this matter.  Defendant reserves all affirmative defenses under Fed. R. Civ. P. 8(c), and any other defense, at law or equity, that may now exist or in the future be available based upon discovery and further investigation in this case.

### First Affirmative Defense – Failure to Comply with a Condition

101.    As to all Counts, a condition subsequent to Defendant's payment obligations under the agreements covering the second, third, and fourth quarter of 2015 was for Plaintiff to provide Defendant with post buy analysis confirmation verifying that Defendant's purchases of unwired broadcast advertisements from Plaintiff actually aired in compliance with such agreements. Given Plaintiff's failure to perform such condition within a reasonable time, Defendant's payment obligation has been released.

### Second Affirmative Defense – Fraudulent or Negligent Inducement

102.    As to all Counts, in May 2015 Defendant agreed to purchase unwired broadcast advertisements from Plaintiff for the third and fourth quarter of 2015 in reasonable reliance upon Plaintiff's purported compliance with the prior agreements of the parties covering Defendant's purchases of unwired broadcast advertisements for the first and second quarter of 2015. Plaintiff, however, either intentionally or negligently failed to disclose to Defendant its non-compliance with the requirements of the prior agreements, thereby falsely inducing Defendant to enter into the third and fourth quarter agreements.

### Third Affirmative Defense – Limitation of Damages

103.     As to all Counts, the agreements between the parties granted Defendant a unilateral right of cancellation upon four weeks' notice, thereby limiting Plaintiff's damages, if any, to those occurring within the four week notice period irrespective of whether Defendant gave notice of cancellation.

### Fourth Affirmative Defense – Failure to Mitigate Damages

104.     As to all Counts, Plaintiff failed to reasonably mitigate its alleged damages upon Defendant's alleged repudiation or cancellation of its contractual obligations or promises.

### Fifth Affirmative Defense – Failure of Consideration

105.     As to Counts I and III, the unsigned document entitled "Cadent Standard Conditions" post-dated the formation of the contract between the parties as to unwired broadcast advertising and therefore cannot constitute a binding modification to the contract because it is not supported by consideration.

### Sixth Affirmative Defense – Unclean Hands

106.     As to all Counts, Plaintiff is barred from seeking relief due to Plaintiff's unclean hands arising from Plaintiff's misrepresentations concerning its performance under the agreements between the parties.

### Seventh Affirmative Defense – Offset

107.     As to all Counts, to whatever extent Plaintiff may be entitled to recovery against Defendant, or to the extent Defendant overpaid Plaintiff, Plaintiff's recovery is subject to offset based upon Defendant's Affirmative Defenses and Counterclaim.

**Eighth Affirmative Defense – Prior Breach**

108.    As to all Counts, Plaintiff's claims are barred based upon its prior breach of its agreements with Defendant.

WHEREFORE, Defendant, Hunter, Hamersmith & Associates Advertising, Inc., respectfully requests that judgment be entered in its favor and against Plaintiff, TelAmerica Media, LLC dba Cadent Network.

*[This Space Intentionally Blank]*

## COUNTERCLAIM

Defendant, HUNTER, HAMERSMITH & ASSOCIATES ADVERTISING, INC., sues Plaintiff, TELAMERICA MEDIA, LLC d/b/a CADENT NETWORK, and alleges:

### NATURE OF THE ACTION

1.      This is an action to recover from Plaintiff the sum of $1,147,913.00 based on Plaintiff's breach of contract and its violation of its duty of good faith and fair dealing arising from Defendant's purchase of TV advertising spots from Plaintiff in 2015.

### JURISDICTION AND VENUE

2.      Personal jurisdiction and venue are proper in this District because this is a Counterclaim filed in the same action brought by Plaintiff in this District.   Subject matter jurisdiction is proper because this Counterclaim constitutes a diversity action between citizens of different states where the amount in controversy exceeds the sum or value of $75,000.00.

### THE PARTIES

3.      Plaintiff is a Delaware limited liability company with its principal place of business located in Pennsylvania.

4.      Defendant is a Florida corporation with its principal place of business located in Florida.

### GENERAL ALLEGATIONS

5.      For 15 years Defendant purchased from Plaintiff cable advertising spots on national cable networks (the "Cable Spots").   Defendant ordered these Cable Spots for the account of its principal client, Unique Vacations, Inc. ("Sandals"), which used the Cable Spots to run commercials for its Sandals Resorts and Beaches Resorts.

6.      Based on the long-standing course of dealings between the Plaintiff and Defendant, the Cable Spots ordered by Defendant would specify the length of time of the Cable

Spot would run (e.g. 15 or 30 seconds), and the time of day (e.g. 6:00 a.m. to 12:00 p.m., 12:00 p.m. to 6:00 p.m., or 6:00 p.m. to 12:00 a.m.). The Cable Spots ordered would also identify the particular network where the Cable Spots would run (e.g., CNN), but allowed Plaintiff to substitute other networks if they were on the network schedule and were of similar prominence (e.g., Fox News or MSNBC). Defendant's orders for the Cable Spots were tailored as to when and where the Cable Spots would run so as to best reach Sandal's target customers. Plaintiff was fully familiar with Defendant's advertising objectives and requirements for Sandals.

7.     Defendant would pay Plaintiff for the Cable Spots, subject to later adjustment based on verification that the Cable Spots had actually run. Based on the verification, Defendant would then receive payment from Sandals.

### The First Quarter Unwired Broadcast Contract

8.     In December 2014, Defendant sought to purchase from Plaintiff additional Cable Spots on Fox News. But Plaintiff's representative, Ivan Silverman, advised Defendant that Plaintiff did not have any additional Fox News inventory available. Instead, he proposed placing the Sandals spots in a new type of inventory – a type never before used by Defendant – then being offered by CNN for the First Quarter 2015. Silverman described this inventory in a December 24, 2014 email:

> CNN network actually barters programming (news feeds) to local broadcast stations across the country in exchange for inventory. We have a deal with CNN which gives us access to this news inventory at great rates. We can offer you a package of 1 spot for a week in AM news and 1 spot per week in Evening and Late news for $18,000.00 a week. I have attached a list of stations that this inventory will be airing on.

9.     Silverman proposed, on behalf of Plaintiff, that Defendant purchase from Plaintiff the available CNN broadcast inventory of Unwired Broadcast Spots to run Sandals advertisements. Under Plaintiff's proposal these Unwired Broadcast Spots would run on stations

known in advance; appear during News in the morning, late afternoon, and evening; and cover 85% of the U.S. in 139 specified markets ranked by population (each known as "Designated Market Area" or "DMA"). Within each DMA, the proposal identified a list of stations where the Unwired Broadcast Spots would air.   Plaintiff would further guaranty the total number of advertising "impressions" – a measure of viewers – the Unwired Broadcast Spots would generate during the First Quarter based on the total number of Unwired Broadcast Spots Defendant purchased.

10.    In an email exchange on December 29, Defendant's representative, Brian Ludwick, asked Silverman to advise on Plaintiff's cancellation policy for the Unwired Broadcast Spot program.   Silverman stated "this inventory has a 4 week cancellation policy as it is fixed inventory."

11.    Based on Silverman's representations, industry custom and practice, and the terms of Plaintiff's written proposal dated January 6, 2015, Defendant accepted Plaintiff's proposal and ordered the Unwired Broadcast Spots for First Quarter 2015 at a cost of $449,000.00. On February 26, 2015, Defendant placed an additional order for Unwired Broadcast Spots for First Quarter 2015 at a cost of $45,000.00.  Plaintiff invoiced Defendant monthly for the Unwired Broad Spots which Defendant paid in full.

12.    In parallel to the new Unwired Broadcast Spot program, Defendant continued its long-standing practice of purchasing Cable Spots from Plaintiff, and ordered Cable Spots for the First Quarter from Plaintiff, and ultimately for the Second and Third Quarters as well.  Plaintiff invoiced Defendant for the First Quarter Cable Spots at a cost of $2,157,795.00, which Defendant paid in full. After determining that Plaintiff had under-delivered cable spots for a prior quarter, Plaintiff credited Defendant's account by $199,288.00.

### The Second Quarter Unwired Broadcast Contract

13.     Prior to the completion of the First Quarter, Defendant sought to continue using Unwired Broadcast Spots in the Second Quarter similar to its use in the First Quarter, and asked Plaintiff to propose purchases covering Unwired Broadcast Spots.

14.     At a March 11 meeting held at Defendant's offices in North Miami, Plaintiff's representatives, Silverman and Linda Martin, initially offered a written proposal offering $155,000.00 in Unwired Broadcast Spots – well below the First Quarter program.  Plaintiff explained that Unwired Broadcast programming was new for Plaintiff, and that Plaintiff had neither the existing inventory nor the personnel on hand to assemble the amount of Unwired Broadcast Spots inventory Defendant sought for the Second Quarter, but would nonetheless replicate the programming for the First Quarter. The proposal included a market list that correlated the number of advertising impressions generated by the Unwired Broadcast Spots for each of the listed DMAs with the population for each DMA.

15.     On March 13, Plaintiff offered Defendant an Unwired Broadcast program for the Second Quarter costing $413,500.00, which Defendant approved on March 16. (A copy of the March 13 proposal is attached as Exhibit "A.")  On April 21, Plaintiff offered Defendant more Unwired Broadcast Spots for the Second Quarter -- in addition to the spots already covered by the March 13 proposal -- costing $585,148.00, which Defendant approved on April 21, 2015. (A copy of the April 21 proposal is attached as Exhibit "B.") Altogether, Defendant agreed to purchase from Plaintiff $998,648.00 in the Unwired Broadcast Spots program as proposed for the Second Quarter (the "Second Quarter Proposals"), subject to the terms set forth in Paragraph 16 below.

16.     Based on the written Second Quarter Proposals, the representations made by Plaintiff to Defendant orally and in writing, and industry custom and practice, the parties agreed that Plaintiff would deliver to Defendant the following advertising program for the Unwired Broadcast Sandals spots during Second Quarter:

(a) The Unwired Broadcast Spots would air during News and Syndicated programming;

(b) The Unwired Broadcast Spots would air in the morning news (4:30 a.m. - 10:00 a.m.) and late afternoon and evening news (4:00 p.m. – 12:00 a.m.) and on syndicated programming (9:00 a.m. - 12:00 a.m.);

(c) The Unwired Broadcast Spots would appear in each of the Designated Market Areas;

(d) The Unwired Broadcast Spots would appear on one or more of the "prototypical" stations identified on the station lists for each DMA;

(e) The distribution of advertising impressions created by the airing of the Unwired Broadcast Spots would correlate to the market size of the DMAs;

(f) Based on the number of spots purchased by Defendant, the Unwired Broadcast Spots would generate 108,889,000 advertising impressions across 85% of the U.S. population;

(g) Plaintiff would provide Defendant post buy analysis confirmation, which was recognized as a condition subsequent to the performance of the advertising placement contract.

(h) Defendant had the right to cancel the Unwired Broadcast Spots on 4 weeks' notice;

(The foregoing requirements will be referred to collectively as the "Second Quarter Unwired Broadcast Contract.")

17.     Plaintiff, lacking experience in the Unwired Broadcast Spot market, specially hired Michael Bollo to manage Defendant's Unwired Broadcast program for the Second Quarter.

18.     During the Second Quarter, Plaintiff invoiced Defendant monthly for the Unwired Broadcast Spots. Defendant paid Plaintiff $998,638.00 as called for under the Second Quarter Unwired Broadcast Contract, representing payment in full.

19.     Plaintiff, however, has failed to provide Defendant with the required post buy analysis confirmation verifying the placement of the Unwired Broadcast Spots during the Second Quarter to the present day.   The post buy analysis confirmation represented a condition subsequent to Plaintiff's performance of the Second Quarter Unwired Broadcast Contract. Absent such performance, Defendant is relieved from its payment obligation under the Second Quarter Unwired Broadcast Contract.

20.     Instead, on September 24 Plaintiff provided Defendant with its own internally-generated report of the placement of the Unwired Broadcast Spots purportedly aired during the Second Quarter (the "September 24 Report"). The September 24 Report, however, contained no notarized signature from any representative of Plaintiff verifying the accuracy of the report.

21.     The September 24 Report purported to confirm Plaintiff's compliance with the total impression guarantee set forth in the Second Quarter Unwired Broadcast Contract.  It did just the opposite.  By making careless arithmetic errors in summing, the report understated the total number of impressions actually required. Correcting for this mistake revealed that Plaintiff failed to comply with the total impression guarantee.

22.     In addition, the September 24 Report also reflected that the Unwired Spots did not run in the markets and stations specified by the Second Quarter Unwired Contract in two key respects.  First, the report revealed a sizeable imbalance in the distribution of impressions among the DMAs, whereby the Unwired Broadcast Spots disproportionally aired in the less expensive, lower and bottom tier DMAs, thereby missing a sizeable portion of Sandals' most desirable customers located in the top and upper tier DMAs. Second, the report revealed that the Unwired Broadcast Spots did not air exclusively on the high-end Prototypical Stations identified by the Second Quarter Unwired Broadcast Report for each DMA.

23.     After Defendant disputed the September 24 Report, Plaintiff provided Defendant with a substitute internally-generated report on October 16 (the "October 16 Report").  The October 16 Report purported to cover the same Second Quarter period covered by the September 24 Report.  Nonetheless, the October 16 Report mirrored the same DMA and station discrepancies appearing in the September 24 Report.  Even worse, the October 16 Report provided *different impression figures* from those provided in the September 24 Report.  In particular, the October 16 Report indicated that the total number of impressions purportedly delivered dropped from 108,889,000 impressions, as reported in the September 24 Report, down to 97,304,000, thereby magnifying Plaintiff's non-compliance with the Second Quarter Unwired Broadcast Contract impression requirement.

24.     Reflecting perhaps Plaintiff's own lack of faith in the accuracy its reporting,  no representative of Plaintiff actually signed the October 16 Report even though the report bears both the inked signature of a notary and the imprint of the official notary stamp.  Consequently, the Plaintiff arranged for a notary to notarize a critical document *in blank* -- a breach of the notary's oath – and then delivered this legally-errant document to Defendant for purposes of validating its purported performance under a million dollar contract.

25.     Even accepting the figures in the October 16 Report as accurate, Plaintiff's shortfall in reaching the number of impressions guaranteed under the Second Quarter Unwired Contract entitled Defendant to a refund or credit against future billing.  But Plaintiff has thus far not provided Defendant with either.

26.     Sandals has refused to reimburse Defendant for advancing any of the Second Quarter payments Defendant paid Plaintiff for the Unwired Broadcast Spots based on Plaintiff's failure to provide Defendant with post buy analysis confirmation as required by the Second

Quarter Unwired Broadcast Contract.  Sandals has further refused to accept the contradictory and unnotarized internal reporting as a reliable substitute. Consequently, Defendant has sustained losses of $998,638.00 due to Plaintiff's breach of the Second Quarter Unwired Broadcast Contract.

### The Third Quarter Unwired Broadcast Contract

27.    During early May 2015, Plaintiff's representative, Michael Bollo, urged Defendant to quickly place orders for Unwired Broadcast programs for both the Third Quarter and Fourth Quarter claiming that the available inventory for both quarters was rapidly drying up.

28.    Given the urgency of these representations, Defendant accepted Plaintiff's May 19 proposal for the placement of the Unwired Broadcast Spots during the Third Quarter (the "Third Quarter Proposal").

29.    Based on the written Second Quarter Proposal, the representations made by Plaintiff to Defendant orally and in writing, and industry custom and practice, the parties agreed that Plaintiff would deliver to Defendant an advertising program for the Unwired Broadcast Sandals spots during Third Quarter based on the same type of requirements set forth in the Second Quarter Broadcast Unwired Broadcast contract, except that the added number of spots would increase the total cost of the order to $2,293,098.00 for the Third Quarter (the "Third Quarter Unwired Broadcast Contract").

30.    On June 2, however, Plaintiff finally furnished to Defendant Plaintiff's internally-generated report covering the placement of the Unwired Broadcast Spots purportedly aired for First Quarter (the "June 2 Report").  To Defendant's alarm, the June 2 Report revealed that Plaintiff had failed to place *any* of the Sandals Unwired Broadcast Spots in key top-tier markets such as Atlanta or Washington, DC.  Plaintiff's Brian Ludwick sent Bollo an urgent message by

email expressing his shock: "I'm not sure what to do at this point.  This is going to change everything going forward."   Between June 11 and June 15, Defendant exchanged emails with Plaintiff whereby Defendant sought to cancel or significantly scale back the Third Quarter Program, but the most Plaintiff offered to do was reduce the order by approximately $100,000.00 from $2,293,098.00 to $2,194,654.00.  In doing so, Plaintiff disregarded the representation made by its representative, Ivan Silverman, on December 29, 2014, that the Unwired Broadcast program could be cancelled anytime on 4 weeks' notice.

31.    Plaintiff began invoicing Defendant for the placement of the Unwired Broadcast Spots for Third Quarter.  Defendant made one payment of $149,275.00, covering a portion of Plaintiff's July invoice even through Defendant had still not received any post buy analysis confirmation verifying ad placements for the Second Quarter.

32.    Over two months after the close of the Third Quarter, on December 2, Plaintiff provided Defendant with its own internally-generated report of the placement of the Unwired Broadcast Spots purportedly aired during the Third Quarter (the "December 2 Report").  The December 2 Report reflected a shortfall in the guaranteed number of total impressions required by the Third Quarter Unwired Broadcast Contract.  Plaintiff, however, has not reduced the amount of its claim against Defendant in this action to reflect such shortfall.

33.    To date, Plaintiff has failed to provide Defendant with the required post buy analysis confirmation verifying the Unwired Broadcast Spots for the Third Quarter.  Such verification represents a condition subsequent to Plaintiff's performance of the Third Quarter Contract.  Absent such performance, Defendant is relieved of its payment obligation under the Third Quarter Unwired Broadcast Contract.

34.     Sandals has refused to pay Defendant for the placement of the Third Quarter Unwired Broadcast Spots because of Plaintiff's failure to provide Defendant with post buy analysis confirmation as required by the Third Quarter Unwired Broadcast Contract. Consequently, Defendant has sustained losses of $149,275.00 due to Plaintiff's breach of the Third Quarter Unwired Broadcast Contract.

## COUNT I – BREACH OF CONTRACT
## Second Quarter Unwired Broadcast Contract

35.     Defendant incorporates the preceding paragraphs 1-34 by this reference.

36.     This is an action for breach of contract.

37.     Defendant and Plaintiff entered into a binding agreement whereby Defendant would purchase Unwired Broadcast Spots from Plaintiff in accordance with the terms of the Second Quarter Unwired Broadcast Contract as set forth in Paragraph 16 above.

38.     Defendant satisfied its obligations under the Second Quarter Unwired Broadcast Contract.

39.     Plaintiff breached its obligations under the Second Quarter Unwired Broadcast Contract by (a) failing to properly distribute the Unwired Broadcast Spots among the specified DMAs, (b)  failing to place the Unwired Broadcast Spots on the specified prototypical stations within the specified DMAs, (c) failing to satisfy the total number of Unwired Broadcast Spot impressions for the Second Quarter, (d) failing to provide proper verification as to where the Unwired Broadcast Spots actually aired, and (e) failing to provide post buy analysis confirmation verifying where the Unwired Broadcast Spots actually aired.

40.     In the alternative, to whatever extent the Second Quarter Unwired Broadcast Contract did not create guaranteed obligations, Plaintiff failed to use its best efforts in attempting

to fulfill its obligations, or otherwise breached its implied duty of good faith and fair dealing in its performance of the contract.

41.     Defendant has been damaged by Plaintiff's breach of the Second Quarter Unwired Broadcast Contract in the amount of $998,648.00.

## COUNT II – BREACH OF CONTRACT
### Third Quarter Unwired Broadcast Contract

42.     Defendant incorporates the preceding paragraphs 1-34 by this reference.

43.     This is an action for breach of contract.

44.     Defendant and Plaintiff entered into a binding agreement whereby Defendant would purchase Unwired Broadcast Spots from Plaintiff in accordance with the terms of the Third Quarter Unwired Broadcast Contract as set forth in Paragraph 29 above.

45.     Defendant was released from its payment obligations under the Third Quarter Unwired Broadcast Contract by reason of Plaintiff's failure to perform conditions subsequent to the contract.

46.     Plaintiff breached its obligations under the Third Quarter Unwired Broadcast Contract by (a) failing to properly distribute the Unwired Broadcast Spots among the specified DMAs, (b)  failing to place the Unwired Broadcast Spots on the specified prototypical stations within the specified DMAs, (c) failing to satisfy the total number of Unwired Broadcast Spot impressions for the Third Quarter, (d) failing to provide proper verification as to where the Unwired Broadcast Spots actually aired, and (e) failing to provide post buy analysis confirmation verifying where the Unwired Broadcast Spots actually aired.

47.     In the alternative, to whatever extent the Third Quarter Unwired Broadcast Contract did not create guaranteed obligations, Plaintiff breached the contract by failing to use its

best efforts in attempting to fulfill its obligations, or otherwise breached its implied duty of good faith and fair dealing under the contract.

48.     Defendant has been damaged by Plaintiff's breach of the Second Quarter Unwired Broadcast Contract in the amount of $149,275.00.

WHEREFORE, Defendant respectfully requests judgment against Plaintiff dismissing its claims in their entirety and awarding damages to Defendant on its counterclaims as follows:

A.     As to Count I of the Counterclaim, judgment in the amount of $998,648.00, plus interest and costs;

B.     As to Count II of the Counterclaim, judgment in the amount of $149,275.00, plus interest and costs;

C.     Such other relief as the Court deems just.

Dated: September 12, 2016

**FRANKFURT KURNIT KLEIN & SELZ P.C.**

By:    _/s/ Craig B. Whitney_
            Craig B. Whitney
Andrew J. Ungberg
488 Madison Avenue, 10th Floor
New York, New York
Tel: (212) 980-0120
Fax: (212) 593-9175
cwhitney@fkks.com
aungberg@fkks.com

-and-

**PERETZ, CHESAL & HERRMANN, PL**
Steven I. Peretz (Fla. Bar No. 329037)*
Michael B. Chesal (Fla. Bar No. 775398)*
2 S. Biscayne Boulevard, Suite 3700
Miami, Florida 33131
Tel: (305) 341-3000
Fax: (305) 371-6807
speretz@pch-iplaw.com
mchesal@pch-iplaw.com

*Admission Pro Hac Vice Pending*

*Attorneys for Defendant Hunter, Hammersmith & Associates Advertising, Inc.*